**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | | |
|---|---|---|
| LAURA SHEETS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 4:11-CV-51-TLS-PRC |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| Defendant. | ) | |

**FINDINGS, REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE PURSUANT TO**
**28 U.S.C. § 636(b)(1)(B) & (C)**

This matter is before the Court on a Complaint [DE 1], filed on September 20, 2011, and a

Brief in Support of Complaint [DE 12], filed on January 3, 2012. Plaintiff requests that the

Administrative Law Judge's decision to deny her disability benefits be reversed or, alternatively,

remanded for further proceedings. On April 12, 2012, the Commissioner filed a response, and on

April 26, 2012, Plaintiff filed a reply.

On September 27, 2011, District Court Judge Theresa L. Springmann entered an Order [DE

5], referring this matter to the undersigned Magistrate Judge for a report and recommendation on

the instant motion pursuant to 28 U.S.C. § 636(b)(1)(B). This Report constitutes the undersigned

Magistrate Judge's combined proposed findings and recommendations pursuant to 28 U.S.C. §

636(b)(1)(C).

For the following reasons, the Court recommends that Judge Springmann grant the relief

requested in the Brief in Support of Complaint and remand this case for further proceedings.

## PROCEDURAL BACKGROUND

On July 10, 2007, Plaintiff filed an application for a period of disability, seeking disability insurance benefits and alleging an onset date of May 1, 2002. Plaintiff alleged disability due to chronic fatigue, fibromyalgia, depression, reflux, and diabetes. The District Office investigated her work activity and concluded that Plaintiff did not stop substantial gainful activity until April 1, 2006, and recommended that date as the earliest possible onset date. Plaintiff's application was denied initially on November 2, 2007, and subsequently upon reconsideration on January 28, 2008. Plaintiff filed a timely request for a hearing, which was held before Administrative Law Judge ("ALJ") Ronald T. Jordan on November 9, 2009. In appearance at the hearing were Plaintiff, her attorney James F. Roth, and Vocational Expert Constance R. Brown.

On March 19, 2010, the ALJ issued a decision denying Plaintiff's application. The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2012.

2. The claimant has engaged in substantial gainful activity since May 1, 2002, the alleged onset date (20 CFR 404.1571 et seq.).

3. The claimant has the following severe impairments: obesity, fibromyalgia, osteoarthritis in the right knee, and depression (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift, carry, push or pull 20 lbs. occasionally and 10 lbs. frequently. She can stand and walk 6 hours in an 8 hour day and sit 6 hours. She has no limitation in performing postural activities such as stooping, balancing, crouching, crawling, kneeling and climbing. Plus, she has no limitation on the use of her upper extremities for handling or fine manipulation, other than the weight restrictions of light work. However, her

work environment should be no more than mild to moderately stressful and she should not be required to meet unusually high time or production quotas. She can, however, occasionally remember and carry out detailed or complex instructions.

6.    The claimant is capable of performing past relevant work as a Receptionist (D.O.T. #237.367-038) and a Companion (D.O.T. #309.677-010). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2002, through the date of this decision (20 CFR 404.1520(f)).

AR 13-20.

Plaintiff sought review of the ALJ's decision. On August 3, 2011, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner.

## FACTUAL BACKGROUND

### A.  Personal Background

Plaintiff was born in 1956 and was 54 years old when the ALJ rendered his decision. She was 50 years old when substantial gainful activity ceased. Plaintiff earned a high school equivalency diploma in 1995. Prior to the onset of her disability, she had worked as a receptionist, housing coordinator, clerk, clerk's assistant, and assistant manager.

### B.  Medical Background

On February 7, 2003, Dr. Ruben F. Vizcarra wrote a letter to Plaintiff's insurance company, recommending that Plaintiff undergo bariatric surgery based upon his treatment of her for weight gain, fibromyalgia, depression, and acid reflux that began after her first stomach surgery, which was

performed in 1990. He opined that the surgery would improve Plaintiff's ability to ambulate, which would help her fibromyalgia and depression.

On February 12, 2003, Dr. John M. Brown wrote a letter stating that obesity was a major health problem for Plaintiff. He indicated that she weighed 264 pounds and that her body mass index ("BMI") was 45. He explained that, following Plaintiff's gastric bypass surgery in 1990, she suffered from "dumping" syndrome, vomiting at least one time per day after eating.

On February 17, 2003, Thomas S. Brodar, D.C., who had been Plaintiff's chiropractor since 1987, wrote a letter recommending that Plaintiff undergo gastric bypass surgery. He wrote that, immediately after her gastric bypass surgery, the reduction in her body weight helped her spinal and skeletal problems. Dr. Brodar commented that Plaintiff has developed depression because of her poor health. He also noted that Plaintiff has reported "dumping" syndrome following the gastric bypass surgery. He opines that the excessive vomiting may have damaged her internally. Dr. Brodar also commented that her fibromyalgia could be helped if she was able to have corrective surgery so that she could increase her rate of exercise.

On February 25, 2003, Plaintiff underwent an esophagogastroduodenoscopy because of her vomiting, reflux, and epigastric pain. The scope was passed through the stomach and it was "a tight fit." (AR 392). The opening was about 1 cm. There was no evidence of esophagitis and no staple line disruption. The stomach and duodenum were normal.

On March 15, 2003, Dr. RoseMarie Jones wrote a letter to Plaintiff's insurance company, stating that, in order to remove the gastric ring, prevent obstruction, alleviate Plaintiff's vomiting, and minimize the risk of developing Barrett's metaplasia, Plaintiff needs to have a revision of the gastric surgery.

On April 25, 2003, Dr. Vizcarra wrote another letter to the insurance company, stating that Plaintiff needs to have a revision of her gastric procedure that was done in 1990 because of excessive vomiting on a daily basis with blood noted. He indicated that the opening to her stomach is less than one millimeter.

On March 4, 2004, Plaintiff saw Dr. Jordan Dutter about her fibromyalgia and pain medication Lortab. Plaintiff appeared to be doing "reasonably well" with her fibromyalgia but she had a lot of pain. Plaintiff agreed that she was probably dependent on the Lortab. The decision was made to try Ultram to see if it could better control her pain.

On July 24, 2004, in response to the physicians' letters, Plaintiff's insurance company wrote that "surgical intervention for obesity is not a covered benefit under [the Plan], but is instead excluded for coverage." (AR 397). The insurance company found that any additional surgical intervention in Plaintiff's case would be a mechanism for weight loss and denied the request as an excluded benefit.

On December 2, 2005, Plaintiff's doctor noted a diagnosis of osteoarthritis in the right knee after complaints of right knee pain and swelling.

On February 16, 2006, Plaintiff saw her chiropractor and complained that she "hurt all over" after falling on ice six weeks earlier. She received an adjustment.

On May 22, 2006, Plaintiff saw her chiropractor and complained of right hip and leg pain.

On June 30, 2006, Plaintiff complained that she felt she had developed tolerance to her antidepressant, and the doctor changed her medication to Cymbalta.

On August 22, 2006, Plaintiff complained to her chiropractor of low back pain and right leg pain that extended to her knee.

On November 10, 2006, Plaintiff saw her doctor and was diagnosed with diabetes based on lab work. Her fasting glucose level was 204. She also had hyperlipidemia.

On November 15, 2006, Plaintiff complained of right leg pain and low back pain to her chiropractor.

On February 7, 2007, Plaintiff complained to her chiropractor of right leg pain.

On March 15, 2007, Plaintiff saw Dr. Thomas Anderson about her medications and her weight. She was prescribed Byetta for diabetes and was referred to St. Vincent Bariatric Center.

On June 15, 2007, Plaintiff saw her chiropractor and complained of low back pain, pain in both hips, and right leg pain. She received an adjustment.

On June 19, 2007, Plaintiff saw Dr. Anderson about her diabetes and fibromyalgia. She was started on a new diabetes medication, Glipizide.

On July 2, 3, and 6, 2007, Plaintiff saw her chiropractor and complained of low back pain, pain in both hips, knee pain, and leg pain. She received an adjustment.

On July 26, 2007, Plaintiff complained to her chiropractor of left hip and leg pain and low back pain.

Her chiropractor noted, on August 2, 2007, that an x-ray showed mild degenerative joint disease at L4-5.

On September 11, 2007, Plaintiff attended a physical consultative exam at the request of the Disability Determination Bureau. The exam showed significant decrease in the range of motion of her lumbar spine. She also had decreased range of motion in her hips and knees. Plaintiff weighed 258 pounds and was 65.5 inches tall. Her BMI was 42.3. She was unable to get on and off the examination table without assistance. She was unable to walk on heels and toes, to bend all the way

over and get back up, and to squat. Plaintiff was tender to palpation of the spine and her straight leg raise sign was positive. Plaintiff had 14/18 trigger points for fibromyalgia.

On September 27, 2007, B. Whitley, M.D., with the Disability Determination Bureau, found that Plaintiff was capable of performing medium work, limited to only occasional crouching and crawling.

Plaintiff attended a mental status evaluation at the request of the Disability Determination Bureau on October 1, 2007. She reported that she does not always dress, groom, and bathe herself because of depression and that her ex-husband does most of the work around the house. She reported her most frequent activities are sitting, laying, or sleeping and was unable to describe interpersonal relationships outside of her ex-husband and father. The doctor diagnosed Depression and Rule Out Personality Disorder and assessed a GAF of 50.

Joseph A. Pressner, Ph.D., with the Disability Determination Bureau, assessed a Mental Residual Functional Capacity that found Plaintiff was moderately limited in her ability to understand and remember detailed instructions; the ability to carry out detailed instructions; and the ability to maintain attention and concentration for extended periods.

On November 29, 2007, Plaintiff complained to her doctor that she was experiencing epigastric pain and reported that she needed something for stress because Xanax was making her sleepy. She reported that she had been vomiting ten times a week for 17 years. On exam, the doctor noted that she was tender in the epigastric area. She was started on Prilosec and Valium.

Plaintiff's doctor called in an increase in strength of Xanax for her on January 31, 2008.

On April 25, 2008, Plaintiff's doctor called in additional Lortab for pain and Prozac to the pharmacy.

Plaintiff saw her doctor on July 23, 2008, reporting problems with fibromyalgia, knee pain, back pain, and depression. At that time, she was employed staying overnight in handicapped homes. She reported taking six Lortab 10/500 a day and that they make her sleepy.

On May 6, 2009, Plaintiff saw her doctor and complained of ongoing problems with obesity, diabetes, sleep disturbances, chronic back pain, GERD, and depression. She reported problems sleeping and concentrating and chronic back pain. Her medications were continued.

On July 27, 2009, Plaintiff underwent a lift test at Arnett Occupational Health Services on July 27, 2009. She was able to lift 75 pounds during this one-time test.

## C. Plaintiff's Testimony

At the hearing, Plaintiff described her job as a home health aide/companion as a "glorified babysitting job" that did not require any physical work. (AR 31). She testified that she had to sit with the person to make sure the person is all right.

At the hearing when asked about a July 23, 2008 progress note indicating that she walks a mile a day, Plaintiff testified, "Oh, no I don't. I don't know who put that there. I can't walk a mile. . . . I never walked a mile a day. I can't, my knees won't take it. I mean I suppose I could if I stopped and sat and then continued later on in the . . . ." (AR 42). Plaintiff confirmed that she does water aerobics.

Plaintiff testified that she has "been in extremely[sic] pain all the time." (AR 31). Plaintiff testified that she takes Lortab for her fibromyalgia but that the "take[s] way too much." (AR 34). She was being treated at the Arnett Clinic. She was taking the anti-inflammatory medication Celebrex but only as often as she could afford it so she was receiving half prescriptions. She did not

have health insurance and was not receiving Medicaid. She was also taking Prozac for depression and Trazodone to help her sleep. She was also taking aspirin.

Plaintiff testified that she was taking "stomach medicine" (AR 40) because she has "acid reflux so bad from that surgery that needed to be redone." *Id.* As for her vomiting, Plaintiff testified that she can go for a week or so with no problems and then everything she eats she will vomit. She testified that there was no rhyme or reason to the problem.

At the time of the hearing, Plaintiff was working at in-home health care. She testified that she does not have to do anything from a physical exertion standpoint but that the "mental part is hard." (AR 34). She testified that she drives an hour to and from that job.

Plaintiff was living in Ft. Myers, Florida, for ten months but then returned home when her mother was ill. She attempted to work at a restaurant while living in Florida but it only lasted for one week.

When asked what makes the job of a receptionist difficult, she responded that it is the sitting down for long periods of time. She testified that the "sitting tears me up, you know. Just the constant sitting and the stress on my back." (AR 42).

She testified that she has problems with her knees. Specifically, she testified that her knees need to be replaced because they are arthritic. She explained that they swell, hurt, creak, crack, pop, and give out on her. She felt that she could walk one block before she was in "duress." (AR 44).

Plaintiff became emotional at the hearing.

### D. Vocational Expert Testimony

The ALJ asked the vocational expert to consider a hypothetical individual who could lift, carry, push, and pull up to twenty pounds occasionally and ten pounds frequently. The individual

could stand, walk, and sit for six hours during an eight-hour workday, and she could occasionally

stoop, balance, crouch, crawl, kneel, and climb. Work the individual performed could be no more

than mild to moderately stressful, with no high time or production quotas. Her work could involve

only simple repetitive tasks and require no more than occasionally remembering and carrying out

detailed or complex instructions. She could work for stretches of two hours, but she required a break

of ten to fifteen minutes between each stretch of work. The vocational expert testified that the

hypothetical individual described by the ALJ could perform Plaintiff's past work as a receptionist

and as a companion care worker. The vocational expert added that her testimony was consistent

with the Dictionary of Occupational Titles.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and

indicates that the Commissioner's factual findings must be accepted as conclusive if supported by

substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will

reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an

erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial

evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395

F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the

evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment

for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227

F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the

question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to [her] conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**DISABILITY STANDARD**

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The steps are:  (1) Is the claimant engaged in substantial gainful activity?  If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2; (2) Does the claimant have an impairment or combination of impairments that are severe?  If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to Step 4; (4) Can the claimant do the claimant's past relevant work?  If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5; (5) Can the claimant perform other work given the claimant's residual functional capacity, age, education, and experience?  If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC").  "The RFC is an assessment of what work-related activities the

claimant can perform despite her limitations." *Young*, 362 F.3d at 1000. The ALJ must assess the RFC based on all the relevant evidence of record. *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Id*. at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff argues that the ALJ's decision should be reversed and remanded because there are issues with the step one analysis on substantial gainful activity and several errors in the weight and interpretation of the evidence used in making the credibility determination and deciding her residual functional capacity. The Commissioner responds that substantial evidence in the record supports the ALJ's decision. The Court considers each argument in turn.

*1.     Substantial Gainful Activity*

At step one of the sequential evaluation process, the ALJ found that Plaintiff had engaged in substantial gainful activity for nearly a year after she claimed to have been disabled. In her disability claim, Plaintiff alleged a disability onset date of May 1, 2002. However, the ALJ found that Plaintiff engaged in substantial gainful activity from April 2005 until November 2006, which was during the period of alleged disability. Plaintiff agrees that she cannot be found disabled while she engaged in substantial gainful activity but asserts that she can be found disabled after substantial gainful activity ceased. Thus, Plaintiff argues that the ALJ erred when he found that Plaintiff cannot be considered disabled at step one simply because she engaged in substantial gainful activity for over a year during her alleged period of disability.

This argument is a misstatement of the ALJ's overall decision. Although the ALJ found at step one that Plaintiff engaged in substantial gainful activity after the alleged onset date and "therefore cannot be considered disabled," (AR 13), he did not end his analysis at step one. Rather, he continued through the sequential analysis, identifying Plaintiff's severe impairments, finding that none of the impairments meet the listings, assessing her credibility, making a residual functional capacity determination, and ultimately finding Plaintiff not disabled at step four on the basis that she can perform her past relevant work. Thus, because the ALJ made his determination of not-disabled at step four and not at step one, there was no need for the ALJ to adjust the date Plaintiff would have been eligible for benefits based on when her substantial gainful activity ceased. Notably, Plaintiff does not challenge the ALJ's determination that she engaged in substantial gainful activity during the relevant time period. The Court finds that the ALJ did not err at step one.

2.      *Credibility Determination*

In his decision, the ALJ found that Plaintiff's allegations concerning the intensity, persistence, and limiting effects of her symptoms were not credible. Plaintiff argues that the ALJ's credibility determination is not supported by substantial evidence because he improperly considered several pieces of evidence in finding Plaintiff not fully credible. The Court agrees.

In making a disability determination, the Commissioner considers a claimant's statement about her symptoms, including pain, and how they affect the claimant's daily life and ability to work. *See* 20 C.F.R. § 404.1529(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability. *See id.* The Regulations establish a two-part test for determining whether complaints of pain contribute to a finding of disability: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of

impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. 20 C.F.R. § 404.1529(a).

In doing so, the ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1) The individual's daily activities;
(2) Location, duration, frequency, and intensity of pain or other symptoms;
(3) Precipitating and aggravating factors;
(4) Type, dosage, effectiveness, and side effects of any medication;
(5) Treatment, other than medication, for relief of pain or other symptoms;
(6) Other measures taken to relieve pain or other symptoms;
(7) Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3). In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence, the claimant's statement about symptoms, any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant, and any other relevant evidence. *See* SSR 96-7p, 1996 WL 374186 (July 2, 1996).

An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states she is unable to work. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96-7p, at *6. An ALJ "must justify the credibility finding with specific reasons supported in the record." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). An ALJ's credibility determination is entitled to substantial deference by a

reviewing court and will not be overturned unless the claimant can show that the finding is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

First, Plaintiff argues that the ALJ impermissibly played doctor when he stated, "Ultimately, [Plaintiff] receives only conservative treatment with pain medications, and one would expect much more extensive treatment for a disabling impairment." (AR 18). Plaintiff argues that, in addition to medical treatment with her primary care physician, the evidence shows that she has seen a chiropractor regularly for help with pain control and that the ALJ failed to acknowledge this course of treatment with the chiropractor.

"The regulations expressly permit an ALJ to consider a claimant's treatment history." *Simila v. Astrue*, 573 F.3d 503, 519 (citing 20 C.F.R. § 404.1529(c)(3)(v)). In *Simila*, the Seventh Circuit Court of Appeals held that it is reasonable for an ALJ to consider the conservative nature of a claimant's treatment. *Id.* In that case, the claimant "seemed to have his own idea of what treatment he needed" and there was a pattern of drug-seeking behavior and a history of noncompliance. *Id.* The Court of Appeals compared the claimant in *Simila* with the claimant in *Carradine v. Barnhart*, in which the claimant's treatment included morphine and a surgical implant in her spine, finding that "[g]iven the deference we show to an ALJ's factual determinations, we will not question the ALJ's finding that [Simila's] treatment was 'relatively conservative.'" *Id.* (discussing *Carradine v. Barnhart*, 360 F.3d 751 (7th Cir. 2004)). Although Plaintiff in this case is distinguishable from the claimant in *Simila* in that she does not have a history of drug seeking behavior and non compliance or her own idea about what kind of treatment she should receive, Plaintiff is also unlike the claimant in *Carradine* in that she has not had extensive treatment such as morphine or a surgical implant. Plaintiff falls somewhere in between.

Thus, the ALJ did not err by taking into account the nature and history of Plaintiff's treatment history; however, the Court is troubled by the fact that the ALJ defines her treatment history as only "pain medications" but makes no reference to her long history of pain treatment with her chiropractor. Plaintiff followed the treatment prescribed by her doctors and saw her chiropractor regularly for help with pain control. This omission, although possibly insufficient by itself to find that the ALJ's decision is not supported by substantial evidence, is but one example of several errors made by the ALJ in his consideration of the evidence.

Second, Plaintiff argues that the ALJ erred in his assessment of the medical evidence in his credibility determination when he commented that "no doctor has stated that [Plaintiff] is disabled." (AR 18). The absence of such a statement regarding disability does not constitute substantial evidence in support of the ALJ's finding that Plaintiff is not disabled. The issue of whether or not a claimant is disabled is an administrative question reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e); *see also* SSR 96-5p, 1996 WL 374183 (July 2, 1996) ("Medical Source Opinions on Issues Reserved to the Commissioner"). Given that a statement from a doctor that Plaintiff *is* disabled would not be binding on the ALJ, it is curious that the ALJ would rely on the absence of a statement of disability as proof that Plaintiff *is not* disabled. The Commissioner argues that the ALJ did not point out this fact as "proof" of disability but that this fact was only one of many probative factors that he considered in evaluating Plaintiff's credibility. This is a difference without a distinction. In contrast, it would have been proper for the ALJ to consider impairments or limitations observed by Plaintiff's physicians that were inconsistent with Plaintiff's allegations. But he did not do so. The ALJ improperly considered the absence of a statement of disability by a physician as reflecting negatively on Plaintiff's credibility.

Third, Plaintiff objects to the ALJ's use of the July 2, 2004 chiropractic treatment note from Dr. Brodar that Plaintiff had been "doing a lot of unusual lifting and such," (AR 18) (citing AR 305), to discredit Plaintiff. Plaintiff argues that the reliance was improper because the note was from the time period prior to when Plaintiff stopped engaging in substantial gainful activity in 2006. However, Plaintiff alleges an onset date of May 1, 2002, and, therefore, it is proper for the ALJ to consider the report, which is more than two years after the alleged onset date. However, the Court finds the ALJ's reliance on the statement nevertheless troubling because the notation recorded the reason for Plaintiff receiving a chiropractic adjustment on that date; there is nothing to suggest that the observation was made as a statement of Plaintiff's ongoing physical abilities. And, to that extent, the date of the treatment note in 2004 is significant when compared with her more recent treatment notes in 2006, 2007, and 2008 reporting her complaints of pain and limitations.

The Court notes that the ALJ did consider other factors in the same paragraph on credibility, such as that Plaintiff had been able to overcome her pain during her period of alleged disability to work for over a year in 2005 and 2006, which the ALJ found inconsistent with her claims of disabling pain. The ALJ also noted that Dr. Brodar's finding that Plaintiff was "unemployable" and that her activities have reduced her life to "bare existence" were inconsistent with the record because Plaintiff had worked during that same time period and because the statement was made within a letter to the insurance company seeking approval of the bariatric revision. Nevertheless, these two factors by themselves do not constitute a basis on which to support the ALJ's credibility finding given the other errors in the ALJ's assessment of her credibility.

Fourth, the ALJ went on to consider the factor of Plaintiff's daily activities, *see* 20 C.F.R. § 404.1529(c)(3), and concluded that she had "described daily activities which are not limited to the

18

extent one would expect, given the complaint of disabling symptoms and limitations." (AR 19). However, his analysis was limited to two facts of daily activities: (1) work activity and (2) "trips." (AR 19). As an introduction to his consideration of Plaintiff's "trips," the ALJ wrote, "In addition to her work activity, which casts serious doubt on her disability case, . . . ." (AR 19). It was generally proper for the ALJ to consider her work history and attempts to work during her alleged period of disability as adverse to her credibility. *See* SSR 96-8p, 1996 WL 374184 (July 2, 1996). However, the ALJ did not discuss, much less acknowledge, Plaintiff's hearing testimony that "I know since I started working I knew that was going to hurt my case. But I just have no choice, I haven't been with - - I didn't use the system. I didn't go on welfare, food stamps. I needed to work, I had to. And I've been in extremely[sic] pain all this time. And it looks like I can work, and I can but to the expense of not having a life at all." (AR 31). The Seventh Circuit Court of Appeals has found that a claimant with a job may still be found disabled. *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working.); *see also Richards v. Astrue*, 370 F. App'x 727, 732 (7th Cir. 2010) ("A desperate person might force herself to work–or in this case, certify that she is able to work–but that does not necessarily mean she is not disabled.").

As for her "trips," the ALJ discredited Plaintiff because she had traveled out of state on two occasions. The ALJ noted that, "the claimant has taken trips during the alleged period of disability. She went to Ohio recently (Exhibit 4E and 4) and testified about going to Florida for a period of time. Although a vacation and a disability are not necessarily mutually exclusive, the claimant's decision *to go on a vacation* tends to suggest that the alleged symptoms and limitations may have

been overstated." (AR 19) (emphasis added). The document the ALJ cites in reference to Plaintiff's travel to Ohio is a Disability Determination Bureau form completed by Plaintiff on August 1, 2007, on which she reported: "Last week I had to go to Ohio. Family issue, I knew better, but I tried. It has taken me 8 days today to recover from the pain. I also have been to my chiropractor 4 times in 8 days." (AR 182). In his decision, the ALJ does not mention this recovery period or the purpose of the trip. There is no indication that Plaintiff was vacationing or engaging in a greater level of activity that she alleges that she can perform. The ALJ does not discuss the reason for Plaintiff's travel to Florida in his decision. In her testimony, Plaintiff explained that she had moved there for a period of time because of a new relationship. Again, there is no evidence that she was on vacation. In fact, she testified that she had an unsuccessful attempt at work. Although the ALJ himself recognizes that "a vacation and a disability are not necessarily mutually exclusive," the statement is logically inconsistent in this context because it does not appear that Plaintiff was on vacation in either instance and the ALJ essentially finds that a vacation and a disability are mutually exclusive without discussing the evidence favorable to Plaintiff.

The ALJ's conclusion that Plaintiff "is not fully credible regarding her gastric bypass surgery," (AR 18), is not supported by substantial evidence. The ALJ noted that Plaintiff testified that she has had problems with her 1990 procedure and needs a revision. The ALJ then acknowledges generally the opinions of Dr. Jones on March 15, 2003, and of Dr. Rankin on November 21, 2003, but does not explain that both were treating physicians and that both had advocated for Plaintiff to receive the surgery. Rather, "despite" the two opinions, (AR 18), the ALJ relies instead on Plaintiff's insurance company's rejection letter, referencing the statement therein that "[d]ocumentation shows that the patient had an earlier bariatric procedure that apparently has

failed due to the patient overeating the gastroplasty." (AR 397) (July 14, 2004 insurance letter). This insurance letter does not identify the referenced documentation and no evidence from the record has been identified demonstrating noncompliance by Plaintiff.

In contrast, Dr. Jones states in her predetermination letter that "[r]ecently, Plaintiff has developed frequent vomiting and reflux refractory to medication. An EGD performed 2/25/03 showed a tight ring at 1cm refractory to dilation. In order to remove the ring, prevent obstruction, alleviate her vomiting, and minimize the risk of developing Barrett's metaplasia and subsequent malignancy, I have recommended revision of her previous surgery to a gastric bypass with gastroenterostomy." (AR 394). Similarly, Dr. Rankin's November 22, 2003 letter provides that Plaintiff "developed a stricture and a tightening of her surgery site." (AR 417). Dr. Rankin cites Dr. Jones' report and the conclusion that the tightened ring refractory to dilation is causing significant obstruction and vomiting. *Id.* Neither Dr. Jones nor Dr. Rankin mention noncompliance. Drs. Vizcarra, Brown, and Brodar also recommend that Plaintiff's surgery be revised to improve her health; none of the doctors mention noncompliance with the original surgery.

The ALJ then further concludes, based solely on the insurance denial letter, that "[i]nstead of a surgical revision, the claimant could learn to work with the gastroplasty, nor overeat, and learn compliance and portion control through psychotherapy." (AR 18) (citing AR 397). The ALJ does not cite any medical evidence that compliance and portion control through psychotherapy would have the same results as the surgical revision advocated by the physicians. The ALJ's decision to rely on the insurance denial letter rather than the opinions of treating physicians to discredit Plaintiff is not supported by substantial evidence of record. Plaintiff testified at the hearing that she continues to suffer from vomiting and stomach pain.

Fifth, in finding that the evidence "simply does not show such severe pain as to preclude any substantial gainful employment," (AR 17), the ALJ cited a July 23, 2008[1] treatment note indicating that Plaintiff participates in water aerobics and walks a mile a day. In a footnote, the ALJ recognized that, at the hearing, Plaintiff denied walking a mile but found that contemporaneously prepared, objective progress notes are more credible. Although the Seventh Circuit Court of Appeals has found that an ALJ is entitled in some circumstances to give more weight to a claimant's contemporaneous statement than to statements that are made at the hearing before the ALJ, *see Brewer v. Chater*, 103 F.3d 1384, 1392 (7th Cir. 1997), *overruled on other grounds*, it is not clear that this is one of those cases. In *Brewer*, the ALJ found that an earlier written statement by the claimant describing her work was more accurate than her later testimony about the nature of the work. *Id*. In contrast, the earlier "statement" in this case is a treatment note by a physician with no explanation or context. At the hearing, Plaintiff testified that she did not know why someone would have marked that in her chart, and she testified that cannot currently walk a mile and that she "never walked a mile a day." (AR 42). In her brief, she argues that, even if she could walk a mile a day, the ability to engage in irregular physical activity does not necessarily mean that the activity can be sustained at that level of activity over the course of a regular, forty-hour work week.

Sixth, Plaintiff argues that the ALJ erred when he found that, because Plaintiff shops and reads on the internet, emails, reads, works, and can follow instructions, asking her to occasionally remember and carry out detailed or complex instructions is not unreasonable. *See* (AR 18). The ALJ made this conclusion in the context of assessing her mental functional residual capacity as to

---

[1] Plaintiff argues that this treatment note should not be considered because she describes the treatment note as dated March 4, 2004, and, thus, prior to the date that she stopped engaging in substantial gainful activity. However, the treatment note is in fact dated July 23, 2008. Plaintiff incorrectly cites page 416 (March 4, 2004 treatment notes) rather than page 413 (July 23, 2008 treatment note) of the administrative record.

her psychological limitations, finding Plaintiff "simply not credible." (AR 18). Plaintiff contends that "limited activities do not contradict a claim of disabling pain." Pl. Br., p.16 (citing *Villano v. Astrue*, 556 F.3d 558 (7th Cir. 2009)). Plaintiff misunderstands the ALJ's analysis in this paragraph. The ALJ is not considering whether Plaintiff's daily activities belie her claims of disabling pain; rather, the ALJ is considering whether the listed daily activities support *psychological* limitations greater than those that he found her capable of, which was asking her to occasionally remember and carry out detailed or complex instructions. Although pain could certainly impact Plaintiff's concentration, Plaintiff has not identified other evidence in the record regarding her ability to concentrate, follow directions, or remember and carry out instructions that would suggest limitations greater than those imposed by the ALJ.

Based on the foregoing, the Court cannot say in this case that the ALJ's credibility determination is not "patently wrong." The ALJ found that Plaintiff's claims of pain and limitations were not severe enough to prevent her from working at the light exertional level. Although the ALJ considered the requisite factors in assessing credibility, substantial evidence does not support the ALJ's analysis of those factors. Because the ALJ "based his credibility determination on serious errors in reasoning rather than merely the demeanor of the witness . . . [the Court] must remand." *Carradine*, 360 F.3d at 753-54 (*Clifford*, 227 F.3d at 872).

3.      *Residual Functional Capacity*

Plaintiff argues that the ALJ did not properly consider the functional limitations caused by her fibromyalgia when formulating her residual functional capacity ("RFC") and that the errors in his credibility determination impacted the RFC. The RFC is a measure of what an individual can do despite the limitations imposed by his impairments. 20 C.F.R. § 404.1545(a). The determination

of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 404.1527(e)(2); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at Steps Four and Five of the sequential evaluation process. SSR 96-8p. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* The ALJ's RFC finding must be supported by substantial evidence. *Clifford*, 227 F.3d at 870. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." SSR 96-8p, at *5.

Plaintiff argues that the ALJ improperly evaluated her fibromyalgia, which, she reasons, means that his credibility determination adversely affected his residual functional capacity analysis because he did not fully evaluate her limitations. Plaintiff contends that the ALJ shows a misunderstanding of fibromyalgia because he stated that Plaintiff's consultative examination results belie her allegations based on a normal gait and station, joints free of inflammation, effusion, or swelling, and strength of 5/5 in all muscle groups tested. The Commissioner contends that the ALJ was responding not only to Plaintiff's complaints stemming from fibromyalgia but also from limitations that she attributed to "knee pain, swelling, and cracking." (AR 17).

At the outset of the residual functional capacity determination, the ALJ summarizes Plaintiff's allegations of her functional limitations as that she is in "pain all the time" and "cannot move or walk anymore." *Id.* Therein, the ALJ recognizes Plaintiff's testimony that she is limited physically and that her ex-husband takes care of her household chores. He also recited her allegation that "she cannot walk very far because her knees need to be replaced" and that she "based

this conclusion upon her knee pain, swelling, and cracking." *Id.* Finally, the ALJ notes that Plaintiff alleged that her psychological problems caused confusion and memory loss.

The ALJ then notes that, to be found disabled, a claimant must show more than just the inability to work without pain, rather, the "pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." (AR 17). In this case, the ALJ found that the "evidence simply does not show such severe pain as to preclude any substantial gainful activity." *Id.*

The ALJ then analyzed the medical evidence of record, including the findings identified above by Plaintiff regarding her joints. In support, the ALJ cited examinations from both 2003 and 2007 that made these findings regarding her joints; however, the ALJ incorrectly describes these findings from two separate pages of the same November 14, 2003 visit as if they were two separate visits.

The ALJ also cited evidence from the Arnett Clinic, which the ALJ found had become Plaintiff's treating physicians because of her lack of insurance and, thus, the ALJ gave their opinions the most weight. However, the ALJ only cited one piece of evidence from the Arnett Clinic, a record from 2009 that Plaintiff had undergone a "pre placement capability assessment" and that "the examiner determined that [Plaintiff] is '[f]ully capable of performing functions described in job descriptions. No impairment or incapacity identified during evaluation.'" (AR 17) (citing AR 406). However, the "examiner" was a nurse practitioner, not a medical doctor, and thus an "other medical" source. Moreover, the assessment was performed at the request of a potential employer and is only briefly described in the record, showing simply that Plaintiff was able to lift 75 pounds two times during a brief test. The report does not show that she would be able to sustain physical activity at

any level and does not address any limitations regarding strength, range of motion, or pain. It is in this analysis that the ALJ relies on Plaintiff's ability to walk a mile, which the Court addresses above.

After summarizing this evidence, the ALJ went on to acknowledge the medical findings favorable to Plaintiff's claim, including that the September 11, 2007 consultative exam revealed that Plaintiff had 14/18 trigger points for fibromyalgia, a positive straight leg raise, and decreased range of motion. Indeed, Plaintiff was diagnosed by her treating physicians at Arnett Clinic over the years as suffering from pain from fibromyalgia and was being treated for the pain with Lortab, but the ALJ does not discuss this longitudinal treatment of Plaintiff's fibromyalgia.

From all of this evidence taken together, the ALJ concluded that Plaintiff's limitations are not inconsistent with a light exertional residual functional capacity. In his reasoning, the ALJ found that, based on the referenced clinical notes, Plaintiff's functionality is limited only by pain, as opposed to any other physical limitation, and Plaintiff has not pointed to any other evidence demonstrating greater physical limitations than those found by the ALJ. As for her pain, the ALJ found that Plaintiff's prior work history during her alleged period of disability demonstrated that she was able to overcome her pain sufficiently to work.

Fibromyalgia "is a common syndrome in which a person has long-term, body-wide pain and tenderness in the joints, muscles, tendons, and other soft tissue." Pl. Br., p. 13 (quoting United States National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001463/). "[T]he joints are not affected, although the pain may feel like it is coming from the joints." *Id*. (same). Plaintiff argues that, by citing a normal examination of Plaintiff's joints as evidence that her fibromyalgia is not as limiting as alleged is an indication that the RFC is not supported by

substantial evidence because fibromyalgia would nevertheless affect Plaintiff's ability to sustain physical activity. Plaintiff's repeated complaints of constant body pain over many years are consistent with her diagnosis of fibromyalgia.

It is not clear that the ALJ was specifically discussing Plaintiff's fibromyalgia as opposed to her allegations of knee pain when he discusses the lack of remarkable findings in her joints as argued by Plaintiff. However, this is nevertheless an error because the ALJ does not specifically address her fibromyalgia when discussing her pain and limitations yet bases his decision on the fact that her "functionality is limited only by pain." (AR 18). Instead, he discusses her "physical limitations," (AR 17), and her "limitations," (AR 18), generally. The Commissioner is correct that "[i]t is not enough to show that she received a diagnosis of fibromyalgia" because "fibromyalgia is not always (indeed, not usually) disabling." *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). However, the ALJ's failure to specifically discuss the fibromyalgia in the context of her complaints of pain and in combination with the errors in his credibility finding as to the extent of her pain makes it unclear how or if the ALJ considered the limitations resulting from Plaintiff's fibromyalgia in formulating the RFC.

*4.      Mental Residual Functional Capacity and Step Four–Past Jobs*

In the RFC determination, the ALJ found that Plaintiff's allegations of psychological limitations were not fully credible and that asking her to occasionally remember and carry out detailed or complex instructions is not unreasonable. (AR 18). Thus, in the RFC, the ALJ limited Plaintiff to a "mild to moderately stressful" work environment, and the ALJ included these limitations in the hypothetical to the vocational expert. At step four of the sequential analysis, the

ALJ found that Plaintiff could perform her past jobs as a receptionist and a companion based on the vocational expert testimony. As a result, the ALJ found that Plaintiff was not disabled.

After making that determination in his decision, the ALJ went on to recognize that, at the hearing, Plaintiff's counsel questioned whether Plaintiff "would be able to perform her Past Relevant work as a receptionist given her emotional state." (AR 20). The ALJ then acknowledged that Plaintiff was weepy at the hearing but nevertheless concluded that Plaintiff was able to control herself when necessary, giving the example that she is polite and friendly with store personnel when she goes shopping. Based on that analysis, the ALJ concluded that Plaintiff has the emotional composure to perform her past relevant work as a receptionist.

In her brief, Plaintiff argues that he ALJ did not properly consider her ability to control her emotions in a manner that would be acceptable to a competitive employer, reasoning that her ability to control her emotions for a relatively brief period of time while shopping does not mean that she can control her emotions over the course of a regular, forty-hour work week. The Commissioner does not respond to this argument, arguing instead that the ALJ properly found that Plaintiff could return to her past jobs as a receptionist and as a companion based on the VE testimony.

While it is true that the hypothetical to the vocational expert incorporated the limitations for work that is no more than mild to moderately stressful, that has no high time or production quotas, that involves only simple repetitive tasks, and that requires no more than occasionally remembering and carrying out detailed or complex instructions, the hypothetical did not incorporate any limitations based on Plaintiff's ability to control her emotions because the ALJ did not incorporate that limitation in the RFC. Plaintiff is not questioning the ALJ's reliance on the testimony of the vocational expert but rather that the vocational expert did not have sufficient information on which

to render a complete and accurate opinion because of the alleged errors in the ALJ's analysis that led to an RFC that Plaintiff argues is not supported by substantial evidence.

The Court finds that, although the ALJ's reasoning that Plaintiff is able to control her emotions when necessary based on her composure when shopping does not necessarily equate with maintaining composure in a work environment, the error is harmless because Plaintiff has not identified any evidence in the record that she has difficulty controlling her emotions, other than her demeanor at the hearing. Moreover, Plaintiff has not identified any evidence in the record that she had emotional difficulties while working as a companion during her period of alleged disability. Thus, Plaintiff has not met her burden of demonstrating that substantial evidence does not support the ALJ's mental RFC assessment as to her emotional state. However, because Plaintiff's emotional state at the hearing was raised and the ALJ considered it in his decision, on remand the ALJ should consider Plaintiff's ability to control her emotions in formulating the RFC rather than addressing it only at step four of the analysis.

## CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** that Judge Springmann grant the relief sought in the Brief in Support of Complaint [DE 12] and remand this matter for further administrative proceedings.

This Report and Recommendation is submitted pursuant to 28 U.S.C. § 636(b)(1)(C). Pursuant to 28 U.S.C. § 636(b)(1), the parties shall have fourteen (14) days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court. The failure to file a timely objection will result in waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. *Willis v. Caterpillar, Inc.*, 199 F.3d 902,

904 (7th Cir. 1999); *Hunger v. Leininger*, 15 F.3d 664, 668 (7th Cir. 1994); *The Provident Bank v. Manor Steel Corp.*, 882 F.2d 258, 260-261 (7th Cir. 1989); *Lebovitz v. Miller*, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

      SO ORDERED this14th day of January, 2013.

                    s/ Paul R. Cherry
                    MAGISTRATE JUDGE PAUL R. CHERRY
                    UNITED STATES DISTRICT COURT

cc:    All counsel of record